[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 21-11579

Non-Argument Calendar

————————————

MARJORIE COGBURN,

Plaintiff-Appellant,

*versus*

CARNIVAL CORPORATION,
d.b.a. Carnival Cruise Lines,

Defendant-Appellee.

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-22166-UU

————————————

Before WILSON, JILL PRYOR, and ANDERSON, Circuit Judges.

PER CURIAM:

While on vacation aboard a cruise ship, plaintiff Marjorie Cogburn slipped on a puddle of liquid and was injured. She sued Carnival Corporation, the cruise ship operator, for negligence. The district court granted Carnival's summary judgment motion because it found that Cogburn failed to come forward with evidence establishing that Carnival had actual or constructive knowledge of the dangerous condition that caused the fall. Because a reasonable jury could find that Carnival had constructive knowledge that its flooring was dangerously slippery when wet, we reverse.

## I.     FACTUAL BACKGROUND[1]

To celebrate their wedding anniversary, Cogburn and her husband took a five-day cruise on the *Ecstasy*, a Carnival cruise ship.[2] On the second day of the cruise, they planned to eat dinner around 6:30 p.m. To get to the dining room, they took an eleva-

---

[1] Because we write only for the parties, we assume their familiarity with the facts. We do not restate the facts except as necessary to explain our decision.

[2] Where facts are disputed in the record, we recount them here in the light most favorable to Cogburn. *See Smelter v. S. Home Care Servs., Inc.*, 904 F.3d 1276, 1284 (11th Cir. 2018) (explaining that on review of district court's grant of summary judgment, we construe all facts and draw all reasonable inferences in favor of the nonmoving party).

tor to the ship's Promenade Deck. After getting off the elevator, Cogburn and her husband walked along a passageway called "City of Lights Boulevard," heading toward the ship's atrium. They passed by the ship's Metropolis Bar and near its casino's roulette tables.

Other passengers and cruise ship employees also were in the area. Between 10 and 20 passengers were sitting at nearby tables. Other passengers were walking through the same area. A cruise ship employee was working at a roulette table in the ship's casino facing the walkway where Cogburn and her husband were passing, and another was cleaning a nearby gaming table.

As Cogburn and her husband approached the roulette tables, they encountered passengers walking in the opposite direction. Cogburn moved to her right to make room. When she moved to the side, her right foot slipped on a puddle of liquid, and she fell to the ground.

The floor where Cogburn fell was "very, very, very slick." Doc. 46-1 at 65.[3] The puddle of liquid was about five inches by seven inches and consisted of a brown liquid that "looked dirty like it had been there for a while." *Id.* at 27. Cogburn did not notice the puddle before she fell because the flooring, a dark granite tile, was "very shiny." *Id.* at 28. She was unable to identify the specific liquid in the puddle but believed it was a "brown drink or

---

[3] "Doc." numbers refer to the district court's docket entries.

Coke or just dirty water." *Id.* at 27. She noticed that the liquid was room temperature.

When Cogburn fell, her dress absorbed the puddle's liquid. The spot with the liquid felt a "little tacky" and "[s]lightly sticky." *Id.* at 31. It left a large stain on her dress. At the time of the fall, Cogburn was wearing gold wedge sandals with two straps across the toes on top of the foot and an open heel. The wedge sandals were two and half inches high and had "[r]ubber like" soles. *Id.* at 27.

Cogburn's husband, along with another nearby passenger, helped her up. Jennielyn Meneses, the employee who had been cleaning nearby, heard Cogburn fall and went to check on her. She brought Coburn a chair. Cogburn told Meneses that she had slipped but did not mention that she had slipped on a liquid. After attending to Cogburn, Meneses checked the area where Cogburn had fallen and found that it was dry.

While Cogburn was sitting in the chair, she mentioned to her husband that her dress was wet. After a few minutes, she stood up and "limped and hobbled" to the dining room. *Id.* at 29. After she made it to the restaurant, her husband found a wheel-chair for her to use.

After their meal, Cogburn's husband took her in the wheelchair to the ship's medical center. She reported her fall to the nurse on duty. The nurse informed her that the ship's doctor was "not in," but he could call the doctor to come see her. *Id.* at

30. Cogburn said she would wait and see how she felt in the morning. The nurse instructed her to take ibuprofen and use ice.

The next morning, Cogburn returned to the medical center. She was told that the doctor was unavailable because he was off the ship. In the afternoon, when the doctor returned to the boat, he saw her. She reported to the doctor that she had fallen the night before on the Promenade Deck and was having trouble walking. In describing the fall, Cogburn did not mention that she had slipped on a puddle of liquid, but the doctor never asked what caused her to slip. After conducting a physical examination, the doctor took x-rays.

Cogburn then had a telemedicine appointment with an orthopedic surgeon. He diagnosed her with a broken femur and advised that she needed surgery. The surgeon told her that she could remain on the ship but should stay on bedrest and would need to go to the hospital at the end of the trip. For the rest of the voyage, Cogburn generally remained in her room except when her husband transported her in the wheelchair to get fresh air on the Lido Deck or for meals in one of the ship's dining rooms.

The day after the incident, the medical center staff reported Cogburn's fall to the ship's security officers, who opened an investigation. Two security officers asked her to complete a form describing the circumstances of the incident. Cogburn's husband completed the form for her and wrote that she fell after "slipp[ing] on a slick tile." Doc. 57-1 at 270. In response to a question asking what caused the accident, her husband answered, "tile

floors are very slick, could have [been] the type of shoes." *Id.* Cogburn signed the form. Based on the investigation, a security officer created a written report. According to the report, Cogburn stated that the floor was "dry" when she fell. *Id.* at 271. But she denied saying that the floor was dry.

At the end of the voyage, Cogburn disembarked from the ship and was taken by an ambulance to a nearby hospital. She ended up needing two surgeries, including a partial hip replacement. Even with the surgeries, she continues to have trouble walking and must use a cane.

Cogburn sued Carnival in federal district court. She alleged that Carnival was negligent in failing to warn passengers that the Promenade Deck's granite flooring was unreasonably slippery when wet; failing to keep the floor clean and dry; constructing or designing the use of a flooring that was unreasonably dangerous when wet; and failing to adequately maintain the flooring.

During discovery, Cogburn sought information about prior incidents in which passengers had slipped on the granite tile flooring used on the Promenade Deck's walkway. She learned that Carnival used the same granite tile flooring, in different patterns, for the walkways on the Promenade Decks of other ships in the same class. Carnival disclosed that it was aware of dozens of other incidents, which occurred in the three years before Cogburn's fall, in which passengers had fallen on the same type of granite flooring. In one of these incidents, which occurred less than four months before Cogburn's fall, a passenger on the *Ecstasy*, Char-

lene Vermeulen, was injured when she slipped on liquid on the Promenade Deck's walkway across from the roulette tables.

Other information that Carnival provided in discovery showed that officers on the *Ecstasy* and other ships were concerned because passengers were slipping and falling on liquids that had spilled on the granite flooring. Several months before Cogburn's fall, *Ecstasy's* chief security officer reported an ongoing problem with accidents occurring when passengers slipped on spilled liquids on the Promenade Deck near the casino. The chief security officer believed that passengers were spilling liquids when they ordered drinks at a nearby bar, which had no seating, and then carried the drinks through the walkway to find a place to sit. In addition, the captain of another ship reported that "accidents" were occurring because of "spills on the promenade deck," which had the same granite flooring as the *Ecstasy*, stating that it was "difficult to see as the floor is dark." Doc. 57-16 at 2. The captain of a third ship raised the concern that ice was being "dropped" on the Promenade Deck; he instructed staff to take "extra care" as the floor was "very slippery when wet." Doc. 57-1 at 305.

After discovery closed, Carnival moved for summary judgment. The district court granted the motion. The court explained that Carnival could be held liable only if it "had actual or constructive notice of a risk-creating condition." Doc. 70 at 5 (internal quotation marks omitted). The court found that the evidence, even viewed in the light most favorable to Cogburn, did

not show that Carnival had actual or constructive notice of the dangerous condition. As for constructive notice, the court acknowledged that Cogburn had identified dozens of prior incidents in which passengers had fallen on the same granite flooring. But the court found that none of these incidents were similar enough to establish constructive notice because, among other things, there was no "record evidence demonstrating that the prior incidents occurred in the same location where [Cogburn] fell." *Id.* at 7.[4]

This is Cogburn's appeal.

## II.    STANDARD OF REVIEW

"We review *de novo* the district court's grant of summary judgment, construing the facts and drawing all reasonable inferences in favor of the nonmoving party." *Smelter v. S. Home Care Servs., Inc.*, 904 F.3d 1276, 1284 (11th Cir. 2018). Summary judgment is appropriate if the record gives rise to "no genuine dispute

---

[4] The district court gave an alternative and independent reason for granting summary judgment to Carnival on one of Cogburn's claims—that it was negligent in constructing or designing the flooring. The court concluded that this claim failed because Carnival came forward with evidence that it had no role in designing or selecting the granite flooring, and Cogburn had offered no evidence "to even suggest that [Carnival] actually designed, participated in[,] or approved the design of the *Ecstasy's* flooring." Doc. 70 at 10. Because Cogburn does not argue on appeal that the district court erred in granting summary judgment on the negligent construction and design claim, we do not discuss it further. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014).

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.    LEGAL ANALYSIS

"Maritime law governs actions arising from alleged torts committed aboard a ship sailing in navigable waters." *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 720 (11th Cir. 2019). In these cases, we "rely on general principles of negligence law." *Id.* (internal quotation marks omitted). To prevail on a negligence claim, a plaintiff must show "(1) the defendant had a duty to protect the plaintiff from a particular injury, (2) the defendant breached that duty, (3) the breach actually and proximately caused the plaintiff's injury, and (4) the plaintiff suffered actual harm." *Id.* (internal quotation marks omitted).

For the duty element in a maritime context, a cruise ship operator "owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." *Id.* (internal quotation marks omitted). When, as here, the "menace is one commonly encountered on land and not clearly linked to nautical adventure," the question of whether a cruise ship operator owed a duty "hinges on whether it knew or should have known about the dangerous condition." *Id.* (internal quotation marks omitted). Under this standard, the key question is whether the cruise ship operator had "actual or constructive no-

tice of [the] risk-creating condition." *Id.* (internal quotation marks omitted).

"We have identified at least two ways that constructive notice can be shown." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1178 (11th Cir. 2020). First, a plaintiff may establish constructive notice by coming forward with evidence "that the defective condition existed for a sufficient period of time to invite corrective measures." *Guevara*, 920 F.3d at 720 (alteration adopted) (internal quotation marks omitted). Second, a plaintiff may establish constructive notice "with evidence of substantially similar incidents in which conditions substantially similar to the occurrence in question must have caused the prior accident." *Id.* (internal quotation marks omitted).

With regard to the substantially-similar-incident requirement, we have explained that it "does not require identical circumstances[] and allows for some play in the joints." *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1287 (11th Cir. 2015). In applying this standard, the relevant question is whether "the two incidents were similar enough to allow the jury to draw a reasonable inference" concerning the cruise ship operator's "ability to foresee" the incident at issue. *Id.* at 1288 (quoting *Borden, Inc. v. Fla. E. Coast Ry. Co.*, 772 F.2d 750, 755 (11th Cir. 1985)).

Cogburn argues she established that Carnival knew of the dangerous condition created by its granite flooring, which allegedly became unreasonably slippery when wet. She argues that Carnival knew about this dangerous condition because of sub-

21-11579                Opinion of the Court                11

stantially similar incidents in which passengers had slipped on the same flooring when it was wet and because officers had brought up passengers slipping on liquids spilled on this flooring.

Viewing the evidence in the light most favorable to Cogburn, we conclude she established that Carnival had constructive knowledge of the risk-creating condition based on the evidence of Vermeulen's fall. As we explained above, Vermeulen was injured on the *Ecstasy* when she slipped on liquid that had puddled on the granite floor in the walkway on the Promenade Deck near the roulette tables. Because Cogburn and Vermeulen slipped on liquids in the same location, we conclude a reasonable jury could find that based on Vermeulen's fall Carnival could foresee the risk to Cogburn. *See id.* at 1287–88.

The district court determined that Carnival lacked constructive notice because, it said, there was no record evidence "demonstrating that the prior incidents occurred in the same location where [Cogburn] fell." Doc. 70 at 7. We disagree with the district court's assessment of the record because the evidence, when viewed in the light most favorable to Cogburn, reflects that Vermeulen fell in the same spot as Cogburn. Notably, the district court's summary judgment order failed to mention the incident involving Vermeulen.[5]

_____

[5] Carnival argues on appeal that none of the prior incidents Cogburn identified occurred "in the same location where [she] fell." Appellee's Br. at 7. But, like the district court, Carnival never addresses the incident involving Ver-

Because Cogburn came forward with evidence of a substantially similar prior incident, we conclude that she established that Carnival had notice of the risk-creating condition. Given this determination, we need not decide whether any of the other prior incidents that Cogburn identified were similar enough to Cogburn's fall to put Carnival on notice of the risk-creating condition or whether the statements of any captain or safety officer established that Carnival had notice. We also need not address Cogburn's separate argument that even if Carnival lacked actual or constructive notice, her expert's testimony was enough to establish that Carnival was liable for negligently maintaining the granite flooring.

## IV.

meulen or the record evidence showing that she fell in the same spot as Cogburn.

We note that Carnival's corporate representative testified at a deposition that Vermeulen's fall was not similar to Cogburn's. The representative testified that the two incidents were different because the floor was dry when Cogburn fell, where Vermeulen slipped on a liquid. It is true that Carnival's security officers prepared an incident report indicating that the floor was dry when Cogburn fell. But whether the floor was wet or dry when Cogburn slipped is a disputed issue of fact. Because this case is at the summary judgment stage, we must view the evidence in the light most favorable to Cogburn, the nonmovant, and assume that the floor was wet. *See Smelter*, 904 F.3d at 1284.

For the reasons set forth above, we reverse the district court's grant of summary judgment for Carnival and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**